## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JONATHAN STOLLARD,                  )
                                    )
                Plaintiff,          )
                                    )
        v.                          )        1:19cv926
                                    )
C/O GWYNN, et al.,                  )
                                    )
                Defendants.         )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on the "Motion to Dismiss" (Docket Entry 15) (the "Motion").[1]  For the reasons that follow, the Court should grant in part and deny in part the Motion.

## BACKGROUND

In September 2019, Jonathan Stollard (the "Plaintiff"), an inmate with the North Carolina Department of Public Safety (the "NC DPS"), commenced this action pursuant to 42 U.S.C. § 1983 against certain officials at Caswell Correctional Center (the "Caswell CI" or "Caswell") for their alleged violation of his constitutional rights during his incarceration at Caswell.  (See Docket Entry 2 (the "Complaint") at 1-15.)[2]  More specifically, the Complaint

---

[1]  For legibility reasons, this Opinion uses standardized capitalization, spelling, and punctuation in all quotations from the parties' materials.

[2]  Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination.

identifies the following as defendants:  "C/O Gwynn" and "C/O Stevens," each a "Detention Officer [at] Caswell CI" (<u>id.</u> at 3); "Supt. Carver," the "Corr. Admin. [at] Caswell CI" (<u>id.</u> at 4); "Asst. Supt. Cassade," the "Asst. Corr. Admin. [at] Caswell CI" (<u>id.</u>); and "Caswell CI Medical Dept Officials," identified as "Medical Tech. at Caswell CI." (<u>id.</u>).

According to the Complaint:

On December 17, 2018, Caswell Correction Officers Stevens and Gwynn verbally and physically assaulted Plaintiff.  (<u>See</u> <u>id.</u> at 5.) In particular, Plaintiff "was cursed at [and his hands were] handcuffed behind [his] back [before he was] picked up and repeatedly slammed onto the concrete floor by Correction Officers [Gwynn and Stevens]."  (<u>Id.</u>; <u>see also</u> <u>id.</u> at 12-13 (alleging that Officers Stevens and Gwynn "handcuffed and slammed [Plaintiff] on the floor").)  In addition, Plaintiff "was beaten by [Officer] Stevens[ and Officer] Gwynn."  (<u>Id.</u> at 5.)  This beating caused "numerous severe injuries to [Plaintiff's] wrist, fingers, hands, lower back, and neck area."  (<u>Id.</u> at 13.)  However, Plaintiff "was deprived of immediate medical treatment and placed in a Restrictive Housing Unit."  (<u>Id.</u>)  Plaintiff made "[n]umerous request[s] . . . to receive an Emergency Sick Call, due to numbness in [his] hands, arms, legs, and lower back," but "Defendants and their officials deprived [him] of receiving medical treatment/assistance."  (<u>Id.</u> at 5-6 (brackets omitted).)

2

"Several weeks later after receiving x-ray[s, Plaintiff] was later examined by a medical doctor at a local hospital" (id. at 6), but the intervening "[d]eprivation of adequate medical treatment[ caused] permanent damage[] to [Plaintiff's] wrist, back, hand, neck, and fingers" (id. at 13). Plaintiff also suffers from mental anguish, PTSD, and nightmares from the assault. (Id. at 6-7.) In addition, "as a means of direct retaliation from defendants[, Plaintiff] received [a] transfer from Caswell CI, due to defendants []posing a direct threat to [his] life and safety." (Id. at 6.) Plaintiff filed "Grievance Complaints" regarding these matters. (Id.)

Thereafter, Plaintiff returned and the Clerk issued summonses to "(Caswell CI) Corr. Officer Gwynn" (Docket Entry 5 at 1); "(Caswell CI) Corr. Officer Stevens" (id. at 3); "(Caswell CI) Corr. Admin. Carver" (id. at 5); "(Caswell CI) Asst. Corr. Admin. Cassade" (id. at 7); and "(Caswell CI) Caswell Corr. Medical Staff" (id. at 9). Each summons lists 444 County Home Road, Blanch, NC 27212, the address for Caswell CI, see https://www.ncdps.gov/adult-corrections/prisons/prison-facilities/caswell-correctional-center (last visited Feb. 17, 2021), as the relevant defendant's address. (See Docket Entry 5 at 1-9.) The United States Marshals Service served the summonses and Complaint via certified mail on December 17, 2019. (See Docket Entries 8-11, 14.) The postal service delivered the summonses for Gwynn, Stevens, Carver, and Cassade on

December 20, 2019 (see Docket Entries 8-11), but failed to deliver the summons to the "Caswell Corr. Medical Staff" (see Docket Entry 14 at 2 (reflecting, as most recent update as of March 11, 2020, postal service tracking message dated December 23, 2019, indicating that package remained "In Transit to Next Facility . . . within the USPS network")).

On March 30, 2020, "Defendants Stevens, Gwynn, Carver, and Cassady" moved to dismiss the Complaint on the grounds of, inter alia, "improper service of process[] and Plaintiff's failure to state a claim upon which relief can be granted" (Docket Entry 15 at 1). (See id. at 2.) In response, Plaintiff requested an extension of time to respond to the Motion (see Docket Entry 18 (the "Amendment") at 1), and also sought to "tell [the Court] a little about this incident" (id. at 2; see id. at 2-9 (elaborating on allegations in Complaint)). Dated April 15, 2020 (see id. at 1), and mailed from the Dan River Prison Work Farm (see Docket Entry 18-1 at 1), the Amendment arrived at the courthouse on April 21, 2020 (see id.), and was filed the same day (see Docket Entry 18 at 1). The Court granted the extension request (see Text Order dated July 9, 2020), but Plaintiff made no additional filings (see Docket Entries dated July 9, 2020, to present).

Because Plaintiff submitted the Amendment within "21 days after service of [the Motion]," Fed. R. Civ. P. 15(a)(1)(B), it constitutes an amendment of right under Rule 15 of the Federal

4

Rules of Civil Procedure (the "Rules"). The Amendment provides significantly more detail regarding Officer Stevens's and Officer Gwynn's alleged assault on Plaintiff on December 17, 2018 (see Docket Entry 18 at 2-6),[3] including that Officer Gwynn allegedly picked Plaintiff up "and slammed [him] as hard as he could on[to] the floor" before he "grabbed the back of [Plaintiff's] head" and turned it so that Plaintiff's "face was on the concrete and [then] pushed [Plaintiff's] face into the concrete pushing all his weight on [Plaintiff's] head" (id. at 4). Additionally, the Amendment states:

> Officer Stevens then jump[ed] down onto [Plaintiff] and both Officers together grabbed [Plaintiff's] arms and put handcuffs on [Plaintiff]. Officer Gwynn then grabbed [Plaintiff's] right thumb and ben[t] it [un]til it broke. [Plaintiff] felt it and told him he just broke [Plaintiff's] thumb. Officer Gwynn and Officer Stevens both were laughing. Then Officer Stevens grabbed [Plaintiff's] left thumb and bent it until [Plaintiff] felt it break. [Plaintiff] then said you broke my other thumb. The pain was so great [that Plaintiff] started to cry because it really hurt. Then Officer Stevens said you're lucky that's all we f-king did to you. Officer Gwynn the[n] called a Code 4 on the walkie talkie. And Officer Gwynn and Officer Stevens started elbowing [Plaintiff's] sides and punching on [Plaintiff] while they were saying stop resisting. [Plaintiff] was not resisting them[, he] was moving because [he] was being hit and elbowed in [his] ribs. [Plaintiff] ha[s] long hair [and] Officer Gwynn then pulled [his] head off the floor by [his] hair and slammed [his] head back to the floor face first. By this time other officers c[a]me running in and Officer Gwynn and Officer Stevens [we]re saying stop resisting so the other officers jump[ed] on top of [Plaintiff] also. The officers la[id] on

---

3 The Amendment notes that, "[w]hile this was happening there [we]re windows all around [them] so other inmates start[ed] to watch this happen." (Id. at 3.)

5

> [Plaintiff] for about 2 or 3 minutes then they snatch[ed
> him] up off the floor[ a]nd Officers Stevens and Sergeant
> Terell walk[ed Plaintiff] across the prison yard bare
> footed to segregation. When [Plaintiff] g[o]t into
> segregation the officers t[ook] him into the strip room.

(<u>Id.</u> at 4-5.)

As to the events that followed, the Amendment alleges:

Officer Stevens directed Plaintiff to remove his clothing, which Plaintiff did. (<u>See</u> <u>id.</u> at 5.) Officer Stevens then gave Plaintiff a series of orders, with which Plaintiff originally complied, but to which he ultimately objected on the grounds that the specified conduct "[wa]s not necessary." (<u>Id.</u>) In response, "Officer Stevens step[ped] up in [Plaintiff's] face while [Plaintiff was] naked and sa[id,] 'You better f-king do it or I will beat your f-king a-s back here.'" (<u>Id.</u>) "At this time another officer walk[ed] in and sa[id] what are you doing put your . . . clothes on now. [Plaintiff] told him [Plaintiff could not because] Officer Stevens ha[d Plaintiff's] boxers in his hand." (<u>Id.</u> at 5-6.) "Officer Stevens threw the boxers at [Plaintiff] and [he] got dressed." (<u>Id.</u> at 6.) "[Plaintiff] was the[n] shackled and handcuffed and chained around [his] waist and then put in a cell," where he stood "for about 20 minutes before the[y] took [him] to medical." (<u>Id.</u>) "When [Plaintiff] got there[, he] told medical that [his] finger[s] were broken. The nurse said 'How do you know?'" (<u>Id.</u>) Plaintiff informed the nurse that he "felt it when the officers broke them. [Plaintiff] was then taken back to

6

Segregation and put into a cell after the chains and cuffs were removed." (Id.)

The Amendment continues:

> Two days later a mobile x-ray nurse came and x-rayed [Plaintiff's] hands. After she took the x-ray she asked was [Plaintiff] ok. [Plaintiff told] her [his] hands hurt really bad[ and] she said they are definitely broken [and] you need to go to the hospital. She then said I'm going to tell them you need to go. [Plaintiff] said ok thank you and was t[a]k[en] back to [his] cell. [Plaintiff] did not go to the doctor until December 31st. [Plaintiff] was in extreme pain for 2 weeks. When [he] went to the doctor on the 31st the doctor asked [him] when this happened[. Plaintiff] told him about 2 weeks ago [and] he said "why did you wait so long to come?" [Plaintiff] told him [Plaintiff] had to wait for them to bring [him and the doctor] said the prison didn't even call to make [Plaintiff's] appointment until the 27th of December. [Plaintiff] told him [Plaintiff] did [not] have any control over making the appointment. The doctor then took [Plaintiff] into his x-ray room and took his own x-rays. When he came back in the room he told [Plaintiff] that [Plaintiff] had to have hard cast[s] put on both hands. He asked how did it happen [and Plaintiff] told him what happen[ed] and he said "Yeah I can see they were forced breaks. But the bad thing is that they have . . . healed deformed because of the time the medical waited to bring [Plaintiff] to the doctor.[")
>
> When [Plaintiff] got back to the prison the Superintendent Mr. Carver came to Segregation to talk to [Plaintiff]. He asked what happen[ed] so [Plaintiff] told him. He then asked was there anybody that could verify [Plaintiff's] story so [Plaintiff] gave him some of the inmates' names that [Plaintiff] knew. He then told [Plaintiff that] "He didn't need this bulls-t happening on his watch because he was trying to retire in 5 months and he was not try[ing to] have to deal with this mess.[" Plaintiff] told him [Plaintiff] didn't either and [Plaintiff] didn't deserve this. Mr. Carver said I know you didn't. He then told [Plaintiff,] he said[,] "I've never even heard your name and you [have] been here 9 months so I know you don't cause any trouble.[" Mr. Carver then asked [Plaintiff] was there another prison that [Plaintiff] want[ed] to go to closer

7

to [his] house. Because he did [sic] need no d-n
lawsuit. [Plaintiff] told him [he] requested to come [to
Caswell] for the welding program to get certification and
[Plaintiff was] only 30 minutes from home. Mr. Carver
then told [Plaintiff that] he would make sure [Plaintiff]
was in the welding program as long as [Plaintiff]
promised not to file a lawsuit. He also said he would
give [Plaintiff] contact visits while [Plaintiff] was in
Seg[regation] which [Plaintiff] know[s] was against the
rules. So that's when [Plaintiff] knew he was trying to
bribe [Plaintiff]. He also told [Plaintiff] the charge
of assault on an[] Officer. That he would make it
disappear. And it did.

     [Plaintiff] stayed in Seg[regation] about 40 some
days and got out and a lawyer came to see [Plaintiff
named] Jacob Daniels. He got all [of Plaintiff's]
paperwork and [Plaintiff has] never seen or heard from
him again. Then in June [Plaintiff] was shipped out to
Salisbury prison [and] when [he] got there [his]
programmer told [him that Plaintiff] signed up for a cook
job in the kitchen. Which [Plaintiff] never did[.
Plaintiff] wanted to weld not cook. So [Plaintiff]
know[s he] was sent the[re] out of retaliation. In
August 2019[, Plaintiff] got honor grade and was sent to
Dan River which is across the street from Caswell [CI].
When [Plaintiff] got [t]here [he] was and still [is]
being harassed by officers [t]here[;] they are asking
what happened and do[es Plaintiff] have a lawsuit. A few
have c[o]me and searched [Plaintiff] and tore up [his]
family pictures and broke [his] stuff and told [him]
Officer[] Gwynn is their hunting buddy and they should
have f-ked [Plaintiff] up more than they did. The
Superintendent [t]here at Dan River Mr. Roach told
[Plaintiff] that this prison and Caswell are a "tight
knit family so of course there is friend and family of
officers at Caswell so [Plaintiff is] just [going to]
have to deal with it.["] Mr. Roach took [Plaintiff's]
girlfriend off [his] visit list. And said [Plaintiff]
shouldn't have filed a suit. So now [Plaintiff] can't
see [his] kids [and his] mail is being held or not even
given to [him]. And not being sent out. [Plaintiff] is
a mechanic by trade and [he] can't use [his] hand to work
so [he] do[es]n't know how [he is] going to take care of
[his] family once [he is] released. [His] hands hurt so
bad. [He] was suppose[d] to do physical therapy for
[his] hands at Caswell but was shipped out and when [he]

8

asked about it the nurse sa[id] there is not paperwork on
it. . . .

(Id. at 6-9.)

## DISCUSSION

### I. Relevant Standards

"Defendants Stevens, Gwynn, Carver, and Cassady"
(collectively, the "Defendants") move to dismiss this action for,
inter alia, "improper service of process" under Rule 12(b)(5).
(Docket Entry 15 at 1.)  As this Court previously explained:

> The plaintiff bears the burden of establishing that the
> service of process has been performed in accordance with
> the requirements of [Rule] 4.  In determining whether the
> plaintiff has satisfied his burden, the technical
> requirements of service should be construed liberally as
> long as the defendant had actual notice of the pending
> suit.  When there is actual notice, every technical
> violation of the rule or failure of strict compliance may
> not invalidate the service of process.  But the rules are
> there to be followed, and plain requirements for the
> means of effecting service of process may not be ignored.

Elkins v. Broome, 213 F.R.D. 273, 275 (M.D.N.C. 2003) (internal
quotation marks and citations omitted).

In addition, Defendants move to dismiss Plaintiff's official-
capacity claims on sovereign immunity grounds, contending that the
Eleventh Amendment bars Plaintiff's official-capacity claims for
monetary damages.  (See Docket Entry 16 at 4-5, 11-12.)  As such,
Defendants present "a facial challenge to subject matter
jurisdiction," entitling Plaintiff to "the same procedural
protection as he would receive under a Rule 12(b)(6)
consideration."  Kerns v. United States, 585 F.3d 187, 192 (4th

9

Cir. 2009) (internal quotation marks omitted). "In [such] situation, the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." Id.

Defendants also move to dismiss certain of Plaintiff's claims pursuant to Rule 12(b)(6). (See Docket Entry 15 at 1; Docket Entry 16 at 1.) In reviewing a Rule 12(b)(6) motion, the Court must "accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff." Coleman v. Maryland Ct. of App., 626 F.3d 187, 189 (4th Cir. 2010), aff'd sub nom., Coleman v. Court of App. of Md., 566 U.S. 30 (2012). The Court must also "draw all reasonable inferences in favor of the plaintiff." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011) (internal quotation marks omitted). Moreover, a pro se complaint must "be liberally construed" and "held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal quotation marks omitted); but see Giarratano v. Johnson, 521 F.3d 298, 304 n.5 (4th Cir. 2008) (explaining that the United States Court of Appeals for the Fourth Circuit has "not read Erickson to undermine [the] requirement that a pleading contain more than labels and conclusions" (internal quotation marks omitted)).

To avoid Rule 12(b)(6) dismissal, a complaint must contain sufficient factual allegations "to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To qualify as plausible, a claim needs sufficient factual content to support a reasonable inference of the defendant's liability for the alleged misconduct. Id. (citing Twombly, 550 U.S. at 556). The complaint need not contain detailed factual recitations, but must provide "the defendant fair notice of what the claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555 (internal quotation marks and ellipsis omitted). "At bottom, determining whether a complaint states . . . a plausible claim for relief . . . will 'be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 679).

Finally, in ruling on a Rule 12(b)(6) motion, "a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." E.I. du Pont, 637 F.3d at 448. The Court may also consider documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Generally, a "court cannot go beyond these documents" without "convert[ing] the motion into one

11

for summary judgment." _E.I. du Pont_, 637 F.3d at 448. Nevertheless, "[i]n reviewing a Rule 12(b)(6) [motion, the Court] may properly take judicial notice of matters of public record." _Philips_, 572 F.3d at 180.

## II. Preliminary Matters

"As a general rule, an amended pleading ordinarily supersedes the original and renders it of no legal effect." _Young v. City of Mount Ranier_, 238 F.3d 567, 572 (4th Cir. 2001) (internal quotation marks omitted). Thus, the filing of an amended complaint normally moots a pending motion to dismiss. _See, e.g._, _Mooney v. Cato Corp._, No. 1:07cv76, 2007 WL 2406961, at *1 (W.D.N.C. Aug. 20, 2007). Here, however, many of Defendants' dismissal arguments apply as equally to the Amendment as to the Complaint. (_See, e.g._, Docket Entry 16 at 8-9 (urging dismissal on grounds that, _inter alia_, "(A) Plaintiff failed to properly serve Defendants; (B) Defendants are entitled to sovereign immunity for official capacity claims; [and] (C) Plaintiff failed to exhaust his administrative remedies").) Under the circumstances, the undersigned will "consider the [M]otion as being addressed to the [A]mend[ment]," 6 Charles Alan Wright, et al., Federal Practice and Procedure § 1476 (3d ed.). _See_ _Brumfield v. McCann_, No. 2:12-cv-1481, 2013 WL 943807, at *2-3 (S.D. W. Va. Mar. 11, 2013) (granting motion to amend complaint, but concluding that court

12

could still consider pending dismissal motions, and collecting cases).

### III. Service Challenge

Defendants first maintain that they "were improperly served because someone else signed for the summons." (Docket Entry 16 at 9.) According to Defendants:

Rule 4(e) states that individuals must be served by

(A) delivering a copy of the summons and of the complaint to the individual personally;

(B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or

(C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e)(2). The rules does [sic] not allow service to be accomplished by leaving a copy of the summons and complaint at *the individual's place of employment* with someone else. Instead, if service is accomplished at the defendant's place of employment, it must be served on the defendant personally.

In this case, the Return of Service clearly indicates that the Summons and Complaint were served at the Caswell Correctional Center — not the Defendants' respective residences. As such, Rule 4 requires that each of the Defendants were required to sign for their respective copies of the Summons and Complaint. However, that did not occur — Amy Durham (not Defendants) signed for the Summons and Complaint. Thus, Plaintiff has improperly served Defendants. Without proper service, the Court lacks personal jurisdiction. Therefore, Plaintiff's Complaint should be dismissed.

(Docket Entry 16 at 9-10 (emphasis in original).)

Relying strictly on Rule 4(e)(2) (see id.), Defendants' argument overlooks Rule 4(e)(1), which permits service by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made," Fed. R. Civ. P. 4(e)(1). North Carolina state law permits service via certified mail to a defendant's place of employment. See, e.g., Moore v. Cox, 341 F. Supp. 2d 570, 573 (M.D.N.C. 2004).

Moreover, if the certified mail receipt "[i]s signed by a person other than the addressee, North Carolina presumes 'that the person who received the mail . . . and signed the receipt was an agent of the addressee authorized by appointment or by law to be served or to accept service of process.'" Godfrey v. Long, No. 5:10-ct-3105, 2012 WL 43593, at *5 (E.D.N.C. Jan. 9, 2012) (ellipsis in original) (quoting N.C. Gen. Stat. § 1A-1, Rule 4(j2)(2)), aff'd, 472 F. App'x 174 (4th Cir. 2012); see also Moore, 341 F. Supp. 2d at 573 (observing that "a person authorized to receive mail is an authorized agent for purposes of receiving service of process in North Carolina").[4] "A party may rebut this presumption of valid service with 'affidavits of more than one person showing unequivocally that proper service was not made upon

---

4  It also bears noting that "[p]olicy considerations likewise do not support [Defendants'] proposed construction:  indeed, many defendants sued in connection with their work might prefer that plaintiffs not be encouraged to seek out their home addresses." Waller v. Butkovich, 584 F. Supp. 909, 926 (M.D.N.C. 1984).

14

the person of the defendant.'" Godfrey, 2012 WL 43593, at *5 (quoting Grimsley v. Nelson, 342 N.C. 542, 545, 467 S.E.2d 92, 94 (1996)). However, "'[a] defendant who seeks to rebut the presumption of regular service generally must present evidence that service of process failed to accomplish its goal of providing defendant with notice of the suit, rather than simply questioning the identity, role, or authority of the person who signed for delivery of the summons.'" D.B.G. v. Robeson Cty. Bd. of Educ., No. 7:18-cv-122, 2019 WL 1005195, at *3 (E.D.N.C. Mar. 1, 2019) (quoting Granville Med. Ctr. v. Tipton, 160 N.C. App. 484, 493, 586 S.E.2d 791, 797 (2003)).

Here, "[t]here is no showing of improper service. On [January 3, 2020], the United States Marshal filed [returns] of service on [Defendants] indicating service on [them] via certified mail, return receipt requested. [(See Docket Entries 8-11.)] The attached return receipt[s] show[] that the delivery was accepted by '[Amy L Durham (see id.)]' who, under North Carolina law, is presumed to be [Defendants'] agent for service of process." Godfrey, 2012 WL 43593, at *5. Defendants failed to file any affidavits challenging service. (See Docket Entries dated Jan. 3, 2020, to present.) Accordingly, "[b]ecause [Defendants] ha[ve] not overcome the presumption of valid service under North Carolina law, the [C]ourt [should] den[y their request to dismiss] based on improper service." Godfrey, 2012 WL 43593, at *5.

15

## IV. Exhaustion Challenge

Defendants next contend that Plaintiff's claims against "Carver and Cassady should be dismissed because Plaintiff failed to exhaust his administrative remedies." (Docket Entry 16 at 16.) Defendants similarly assert that, "to the extent that Plaintiff's Complaint is interpreted to include a claim of retaliation, claim of unauthorized transfer, or some other type of due process claim, . . . such claims should be dismissed because Plaintiff failed to exhaust his administrative remedies." (Id.)

As relevant here, the Prison Litigation Reform Act of 1995, as amended (the "PLRA"), provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). The defendant bears the burden of establishing that a prisoner failed to exhaust administrative remedies. See Jones v. Bock, 549 U.S. 199, 216 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not

16

required to specially plead or demonstrate exhaustion in their complaints.").

Nevertheless, the "exhaustion of administrative remedies under the PLRA is a question of law to be determined by the judge." Drippe v. Tobelinski, 604 F.3d 778, 782 (3d Cir. 2010); see also Lee v. Willey, 789 F.3d 673, 677 (6th Cir. 2015) ("[A]ll . . . of the circuits that have considered the issue agree that judges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury." (internal quotation marks omitted)). A prisoner satisfies the PLRA exhaustion requirement when he "ha[s] utilized all available remedies 'in accordance with the applicable procedural rules,' so that prison officials have been given an opportunity to address the claims administratively." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008) (quoting Woodford v. Ngo, 548 U.S. 81, 88 (2006)). Thus, the relevant prison's grievance procedures determine the steps that a prisoner must take to meet his exhaustion obligations. See id. at 726.

Plaintiff asserts in his Complaint that he filed "Grievance Complaints" regarding the "[a]ctions of defendants." (Docket Entry 2 at 6.) Defendants attached two grievances to the Motion, which NC DPS officials indicate "represent all completed Step 3 appeal [grievance] records" for Plaintiff from January 1, 2018, through March 11, 2020. (Docket Entry 16-1 at 3 (emphasis in original).)[5]

---

5    "The NC DPS provides a three-step administrative review process for inmate grievances." Grady v. Brayboy, No. 1:18cv777,

Plaintiff did not address the grievances in the Amendment. (See Docket Entry 18; see also Docket Entry 17 at 1 (warning Plaintiff that "failure to respond or, if appropriate, to file affidavits or evidence in rebuttal within the allowed time may cause the [C]ourt to conclude that the defendant(s)' contentions are undisputed").)

The first grievance, dated January 1, 2019, states that, "[o]n 12-17-18[,] Officer Gwynn and Officer Stevens broke both [Plaintiff's] thumbs after [he] was placed in handcuffs." (Docket Entry 16-1 at 4 (the "Assault Grievance").) As a remedy, the Assault Grievance requests that Officer Stevens's and Officer Gwynn's "contracts [be] terminated to prevent anyone else from getting hurt the same way or worse." (Id.) The Step One and Step Two responses state that the NC DPS "[wa]s aware of [Plaintiff's] allegations" and undertaking an investigation, which negated the need for "further action . . . at this level" of the grievance process. (Id. at 6; accord id. at 5.) In turn, the Step Three response states:

> This examiner has reviewed this grievance and the response given by staff in the Step 1 and Step 2 responses. My review of this grievance reveals serious allegations made against staff at Caswell C[I], which is [Plaintiff's] current housing location. [Plaintiff] was provided medical care for [his] injuries. [His] medical

---

2019 WL 5064846, at *1 n.3 (M.D.N.C. Oct. 9, 2019), report and recommendation adopted, No. 1:18-cv-777, 2019 WL 11069406 (M.D.N.C. Nov. 6, 2019); see generally State of North Carolina Department of Public Safety Prisons, Policy & Procedures, Administrative Remedy Procedure, https://files.nc.gov/ncdps/div/Prisons/Policy_Procedure_ Manual/G.0300_08_01_13.pdf (last visited Feb. 17, 2021).

concerns related to this incident were resolved in a separate grievance (#00012).

    [Plaintiff's] grievance remedy request was that the staff involved be "terminated", 'so that no one else could get hurt the same or worse from them'. This examiner has determined that the allegations have been investigated (report #4415-18-176) by the Facility Investigator. During the course of this investigations, the staff involved had been assigned duties with NO offender contact so that there would no opportunity for [Plaintiff] to be supervised by them. The investigation appears appropriate, and was referred for review, approval and possible disciplinary action (up to including dismissal) to the Director of Prisons.

    This examiner has verified that the above information and Investigation meets [Plaintiff's] grievance remedy request, therefore the grievance is dismissed as resolved.

(Id. at 7 (emphasis in original).)

    As this response reflects, Plaintiff also filed a grievance regarding the medical treatment he received in connection with his injuries. (See id. at 8 (the "Medical Grievance").) Dated January 16, 2019, this grievance states:

    On 12-17-18[, Plaintiff's] thumbs were injured. The nurses ordered for xrays on 12-19-18. The xrays showed [Plaintiff's] thumbs were broken. Medical failed to set up [Plaintiff] an appointment until 12-27-18[. Plaintiff] didn't go to the doctor until 12-31-18. [Plaintiff] was in extreme pain for 2 weeks[; Plaintiff] stated this to the nurses numerous times[.] They acted like it didn't matter that [Plaintiff] was in pain. Both [his] hands were swollen and were black and blue, purple[,] they were clearly broken.

(Id.) As a remedy, the Medical Grievance requests that the NC DPS "hire medical staff that are more professional and reliable." (Id.) Finding "that prison staff have taken appropriate action to

19

address and resolve [Plaintiff's] concerns voiced in the grievance," the Step Three reviewer deemed the Medical Grievance "resolved by prison staff" and, "therefore, dismissed[ it]." (Id. at 11.)

Neither grievance addresses Plaintiff's claims against Carver or Cassady. (See id. at 4, 8.) Dating from Plaintiff's incarceration at Caswell CI (see id.), the grievances also do not address his claims of retaliatory transfer (see Docket Entry 18 at 8). Plaintiff has therefore failed to exhaust administrative remedies on these claims, necessitating their dismissal. See, e.g., Germain v. Shearin, 653 F. App'x 231, 234 (4th Cir. 2016) ("Given that [the plaintiff] failed to . . . exhaust his claims, dismissal is mandatory.").

## **V. Official-Capacity Claims**

Finally, Defendants move to dismiss Plaintiff's official-capacity claims on the grounds that "the Eleventh Amendment bars such claims." (Docket Entry 16 at 11.) In that regard:

> Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity.

Will v. Michigan Dep't of State Police, 491 U.S. 58, 66 (1989) (citation omitted). Congress did not override States' eleventh-amendment immunity in enacting Section 1983, see id., and "North

Carolina has not waived its sovereign immunity by consenting to be sued in federal court for claims brought under [Section] 1983," Lomick v. Beaver, No. 5:18-cv-57, 2021 WL 328917, at *8 (W.D.N.C. Feb. 1, 2021). Moreover, "a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents." Brandon v. Holt, 469 U.S. 464, 471 (1985). Per the Complaint, Defendants all constitute employees of the NC DPS (see Docket Entry 2 at 3-4), and Plaintiff seeks only "Monetary Rewards" against them (id. at 8). Accordingly, "the Court should dismiss [Plaintiff's official-capacity] claims [against Defendants] because any judgment against them would impose liability on the state, which the Eleventh Amendment would bar." Fuller v. North Carolina, No. 1:12cv1198, 2013 WL 5817652, at *5 (M.D.N.C. Oct. 29, 2013).[6]

_____

    6  In addition, Plaintiff's official-capacity claims against Officer Gwynn and Officer Stevens lacks merit. Under Section 1983, official-capacity liability occurs only if "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Collins v. City of Harker Heights, 503 U.S. 115, 121 (1992) (internal quotation marks omitted). Relevant here, "an official's discretionary acts, exercised in carrying out official duties, do not necessarily represent official policy." Perdue v. Harrison, No. 1:17cv403, 2017 WL 4804363, at *2 (M.D.N.C. Oct. 24, 2017). "Rather, the official must have 'final authority' over government policy with respect to the action in question to trigger official capacity liability." Id. (certain internal quotation marks omitted). The Complaint and Amendment contain no allegations that Officers Gwynn and Stevens either acted pursuant to any NC DPS policy or possessed "final authority" over any such custom or policy. (See generally Docket Entries 2, 18.) Accordingly, Plaintiff's official-capacity claims against Officer Stevens and Officer Gwynn also fail as a matter of law.

## CONCLUSION

Defendants' Rule 12(b)(5) challenge lacks merit, but sovereign immunity precludes Plaintiff's official-capacity claims against Defendants. In addition, Plaintiff failed to exhaust administrative remedies on his claims against Carver and Cassady, as well as his claims against Defendants regarding retaliatory transfer.

**IT IS THEREFORE RECOMMENDED** that the Motion (Docket Entry 15) be granted in part and denied in part as follows: Plaintiff's official-capacity claims against Defendants be dismissed on sovereign immunity grounds and his claims against Carver and Cassady, as well as any retaliatory transfer claim against Defendants, be dismissed without prejudice for failure to exhaust administrative remedies.

This 17th day of February, 2021.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
